**Louis ALEXANDER, Plaintiff,**

v.

**Kerry KAMMER, Clerk of the City of Pontiac, Michigan, et al., Defendants.**

**Civ. A. No. 40298.**

United States District Court, E. D. Michigan, S. D.

Aug. 8, 1973.

Julian Abele Cook, Jr., Russ E. Boltz, (on the brief), Cook and Beer, P.C., Pontiac, Mich., for plaintiff.

Sherwin M. Birnkrant, Director of Law, Dept. of Law, City of Pontiac, Alger H. Strom, Deputy City Atty., Pontiac, Mich., for defendants.

## MEMORANDUM OPINION

FEIKENS, District Judge.

This case comes before the court on a motion for preliminary injunction in which plaintiff seeks to restrain the defendants, City of Pontiac, City Commission of Pontiac, and Kerry Kammer, Clerk of the City of Pontiac, from refusing to accept plaintiff's petition for nomination to the City Commission and certify him as eligible to stand for election. The refusal is based on that city's durational residency requirements for such candidates. The parties have agreed to a comprehensive joint stipulation of facts, and "both parties request the Court to enter its decision in this matter based on this stipulation and the applicable law."

## FACTS

Plaintiff, Louis Alexander, has been a resident of the City of Pontiac since approximately July 1, 1969, and has resided at his present address since approximately September 1, 1972. On June 8, 1973, plaintiff attempted to file petitions for his nomination to the office of

City Commissioner from District 5 of the City of Pontiac. Defendant Kammer refused to accept these petitions on the grounds that plaintiff had not been a resident of the City for five years and of his district for two years as required by Section 3, Chapter III, of the City Charter.[1] Plaintiff admits that he does not meet these conditions of residency. However, his nominating petitions and candidacy are in all other respects in full compliance with applicable requirements.

On June 19, 1973, this court issued a temporary restraining order enjoining enforcement of the durational residency requirements. Defendant Kammer then accepted and filed plaintiff's nominating petitions.

## JURISDICTION

■■ Initially, the court notes that plaintiff's cause of action proceeds under 42 U.S.C. § 1983 and 28 U.S.C. § 1343. The United States Supreme Court has recently declared, in City of Kenosha v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), that a city is not a "person" within the meaning of Section 1983, and there can be no relief granted against a municipality thereunder. The court had previously determined that a city could not be held liable for damages under Section 1983 in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). *Kenosha* extends this restriction to equitable relief as well. Therefore, this court must, *sua sponte,* dismiss both the City Commission of the City of Pontiac and the City of Pontiac from this lawsuit. Since its jurisdiction under Section 1343 depends upon the statement of a claim under Section 1983, the plaintiff's inability to reach the municipality under the latter provision effectively removes these parties from the ambit of Section 1343. The third defendant, Kerry Kammer, is a "person" within the meaning of the statute and a proper party against whom relief may issue under Section 1983.

## EQUAL PROTECTION

Plaintiff contends that Pontiac's residency requirements are invalid as a deprivation of his fourteenth amendment right to equal protection of the laws and his constitutional right to travel interstate.

"To decide whether a law violates the Equal Protection Clause, we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." Dunn v. Blumstein, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972).

■ 1. *The Interests Affected by the Classification*—The first step in resolving the equal protection claim is to determine whether the challenged classification is to be tested according to the traditional standard, under which the defendant need only show a rational relationship between the discrimination and a legitimate public interest, or whether defendant must carry the far heavier burden of demonstrating that the restriction is "necessary to promote a *compelling* governmental interest." Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). The latter test is applicable whenever the discrimination (1) affects a "fundamental right" or (2) creates a "suspect classification." San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The right to vote has been very explicitly recognized as a fundamental

---

[1] " . . . No person shall be eligible to hold the office of Commissioner who is not thirty years of age, a citizen of the United States, and a resident of the City of Pontiac for a period of five consecutive years, and of the district in the City which he represents for at least two consecutive years, immediately prior thereto. . . . "

right for purposes of equal protection. *See, e. g.,* Kramer v. Free Union School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). The question presented in the instant case is whether the right to vote includes the right of a potential candidate to run for office and of voters to vote for the candidate of their choice. The Supreme Court has declared that there is a constitutional right to be considered for public office without the burden of invidiously discriminatory classifications. Turner v. Fouche, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). It has also observed that

> "The rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect. candidates always have at least some theoretical, correlative effect on voters. Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. . . . In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972).

In Dunn v. Blumstein, *supra,* the Court applied the strict test to residency requirements which restricted both the right to vote and the right to travel interstate, and concluded that Tennessee could not show a compelling state interest in requiring voters to have resided in the state for one year and in the county for three months prior to registration.

Although these cases are suggestive, they do not decide the precise question presented here. However, a number of lower federal courts have considered this issue, and the great majority have concluded that residency requirements for condidates must be closely scrutinized for a compelling state interest. *See* Bolanowski v. Raich, 330 F.Supp. 724 (E. D.Mich. 1971); Mogk v. City of Detroit, 335 F.Supp. 698 (E.D.Mich. 1971); Green v. McKeon, 335 F.Supp. 630 (E.

D.Mich. 1971), aff'd, 468 F.2d 883 (6th Cir. 1972); McKinney v. Kamisky, 340 F.Supp. 289 (M.D.Ala. 1972); Hadnott v. Amos, 320 F.Supp. 107 (M.D.Ala. 1970), aff'd without oinion, 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971); Draper v. Phelps, 351 F.Supp. 677 (D. Okla. 1972); Chimento v. Stark, 353 F. Supp. 1211 (D.N.H. 1973) (applying a compelling state interest test). *See also,* Stapleton v. Clerk for City of Inkster, 311 F.Supp. 1187 (E.D.Mich. 1970). *But see* Walker v. Yucht, 352 F.Supp. 85 (D. Del. 1972) (rejecting the compelling state interest test).

■ This court agrees with both the reasoning and result of the majority on this issue, and applies the strict test in this case.

2. *The Character of the Classification in Question*—In this case the combined five and two-year residency requirement is even more restrictive than those invalidated in cases cited above (*Bolanowski*—three years; *Mogk*—three years; *Green*—two years; *McKinney*—five years). In two of the cases in which a residency requirement was held to be essential to the achievement of a compelling state interest, the lengths of time involved were one year (*Hadnott*) and six months (*Draper*). Indeed, the opinion in the latter case distinguishes its situation from the cases finding no compelling state interest based on both the length of time and the fact that it involved candidates for a state office (state legislature), as did *Hadnott* (circuit court) and *Chimento* (governor), while the others dealt with candidates for purely local offices. 351 F.Supp. at 686. Such distinctions, to the extent they have merit, certainly cut against defendant in this case.

3. *The Governmental Interests Asserted in Support of the Classification*—Defendant suggests that the residency requirements in question here promote two legitimate governmental objectives: (1) They provide the electorate with the opportunity to become better acquainted with the candidate and (2) They insure the candidate's familiarity with the city

and its needs. It cannot be denied that these are in some measure worthwhile and even laudable objectives. But it is clear that the instruments chosen by the city to effectuate these goals are far too imprecise to justify their continued use. As the Court observed in *Dunn, supra*, 405 U.S. at 343, 92 S.Ct. at 1003:

"It is not sufficient for the State to show that durational residence requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with 'precision,' . . . and must be 'tailored' to serve their legitimate objectives."

As it applied this principle to the facts of that case, it is instructive to note the Court's treatment of the state's purported interests in their residency requirements, interests which are closely analogous to those asserted by defendant in the instant case.

"It may well be true that new residents as a group know less about state and local issues than older residents; and it is surely true that durational residence requirements will exclude some people from voting who are totally uninformed about election matters. But as devices to limit the franchise to knowledgeable residents, the conclusive presumptions of durational residence requirements are much too crude. They exclude too many people who should not, and need not, be excluded. . . . Here, there is simply too attenuated a relationship between the state interest in an informed electorate and the fixed requirement that voters must have been residents in the State for a year and the county for three months." Dunn v. Blumstein, 405 U.S. 330, 359–360, 92 S.Ct. 1012 (1972).

Even assuming that the interests asserted by the City qualify as "compelling," the residency requirement in this case must fail. The fit of means to ends is far too imprecise to satisfy the "tailoring" standard. Were this test satisfied, it is still questionable whether the mutual familiarity between candidates and the City which Pontiac wishes to promote is sufficiently compelling to justify any significant infringement upon the right to vote. That right gives rise to a presumption that "the voters are the arbiters of the suitability of candidates for public office." Green v. McKeon, 468 F.2d 883, 885 (6th Cir. 1972). That freedom of choice may not lightly be restricted.

The defendants having failed to sustain the burden of demonstrating that the regulation in question is essential to the attainment of a compelling state interest, the injunction will continue. Inasmuch as this matter is resolved on equal protection grounds, there is no need to reach plaintiff's contentions concerning the infringement of his right to travel interstate.

An appropriate order may be submitted.