GRANO v ORTISI

CASTNER v ORTISI

Docket Nos. 77-2857, 77-2714. Submitted June 19, 1978, at Detroit.—
Decided October 17, 1978.

Joseph D. Grano attempted to file the required nominating pe-
titions with the City of Grosse Pointe Park for the municipal
judge primary election to be held on August 2, 1977. The city
clerk rejected the petitions because Mr. Grano did not meet
city charter provisions which require that a candidate for
municipal judge be a two-year resident of Grosse Pointe Park
and have been licensed to practice law in Michigan for five
years prior to filing nominating petitions for that office.

Joseph Grano then commenced an action against N. J. Ortisi,
Clerk of the City of Grosse Pointe Park and the Election
Commission for the City of Grosse Pointe Park, seeking to have
the two charter provisions declared unconstitutional. Carol J.
McCloskey, a Grosse Pointe Park resident who signed Grano's
nominating petition and sought to vote for him in the primary
election, was joined as a plaintiff.

Karen Smith Kienbaum and Robert J. Lech, who also had
had their nominating petitions rejected by the city clerk for
failure to satisfy the charter requirements, were allowed to
intervene by stipulation.

Daniel Castner instituted a separate lawsuit after his petition
had been rejected for failure to satisfy the five-year licensing
requirement.

A judgment was entered for the plaintiffs, ruling the charter
provisions to be unconstitutional and ordering the city clerk to
accept the petitions and to place the names of the four prospec-
tive candidates on the primary ballot, Wayne Circuit Court,

REFERENCES FOR POINTS IN HEADNOTES

[1] 16 Am Jur 2d, Constitutional Law § 112.

[2] 46 Am Jur 2d, Judgments §§ 529-534.

[3, 6, 7] 46 Am Jur 2d, Judges §§ 7-12.

63 Am Jur 2d, Public Officers and Employees §§ 47, 48.

[4] 16 Am Jur 2d, Constitutional Law §§ 496, 497.

[5] 63 Am Jur 2d, Public Officers and Employees §§ 47, 48.

Thomas Roumell, J. Defendants appeal. The two cases were consolidated on appeal. *Held:*

1. The issue is not moot, although the election has since been held, because the issue raised is one that is capable of repetition yet may evade review for the reason that the time period between the filing of nominating petitions and the subsequent election is normally too short to allow a case to progress through the appellate system.

2. The doctrines of res judicata and collateral estoppel should not have been applied by the trial court to bar a review of the merits of the present lawsuits because in the 1973 cases against the city, relied upon by the trial judge, there was a different plaintiff and the present suit does not have the mutuality of parties required to evoke either doctrine.

3. The fact that the city standards are more rigid than state standards for justices of the Supreme Court or judges of the Court of Appeals does not mean that the standards in question contravene the state standards.

4. The two-year residency rule does substantially affect the fundamental right of free travel between the states, thus requiring the city to demonstrate that the provision serves a compelling state interest. The city's purported justification does not meet this strict standard. The flat residency rule is too vague and overreaching to be upheld as the least burdensome method of protecting the city's interests.

5. The five-year licensing provision similarly has an adverse affect on the fundamental right of free travel between the states. The city's restriction is too broad to fulfill its stated objective. Both restrictions are unconstitutional as violative of equal protection.

Affirmed.

1. APPEAL AND ERROR—MOOTNESS—MUNICIPAL CORPORATIONS—ELECTIONS—QUALIFICATIONS OF CANDIDATE—MUNICIPAL JUDGES.

A controversy over a city's charter provisions which list residency requirements and a requirement of state bar membership of a certain duration for candidates for municipal judgeships is not moot, even though the primary election involved in the dispute has since been held, because the issue raised is one that is capable of repetition yet may evade review for the reason that the time period between when nominating petitions are filed and the subsequent election held is normally too short to allow the case to progress fully through the appellate system (Charter for the City of Grosse Pointe Park §§ 5.1, 15.3).

2. JUDGEMENT—RES JUDICATA—COLLATERAL ESTOPPEL.

> Neither the doctrine of res judicata nor the doctrine of collateral estoppel applies where, in a subsequent case, the plaintiffs are not the same plaintiffs as in an earlier case and are not in privity to the prior parties; a judgment, to constitute a bar to a claim in a subsequent action, must be rendered upon the merits, upon the same matter in issue, and between the same parties or their privies.

3. COURTS—UNIFORM MUNICIPAL COURT ACT—STANDARDS—STATUTES.

> The uniform municipal court act allows individual standards for municipal judges to be set as long as the standards meet certain minimal requirements; therefore, it cannot be said that standards for municipal judges, set forth in a city charter, contravene the state standards just because the particular municipal standard is stricter in its qualifications for municipal judges than the standard which the state has set for justices of the Supreme Court and for judges of the Court of Appeals (MCL 730.501 et seq., MSA 27.3937[1] et seq.; Charter for the City of Grosse Pointe Park §§ 5.1, 15.3).

4. CONSTITUTIONAL LAW—EQUAL PROTECTION—FUNDAMENTAL INTEREST—SUSPECT CLASSIFICATION—STRICT SCRUTINY—TRADITIONAL TEST.

> A two-tiered approach to equal protection cases has been developed and the test to be employed depends upon the nature of the individual interest affected by the legislation; if the interest is "fundamental" or the classification "suspect", a strict scrutiny test is applied requiring the government to show a compelling interest which justifies the classification; other legislation is subjected to review under the traditional equal protection test and the burden is on the person challenging the classification to show that the classification is without reasonable justification.

5. ELECTIONS—CANDIDATES FOR ELECTIVE OFFICE—RESIDENTIAL REQUIREMENTS—CONSTITUTIONAL LAW—RIGHT TO VOTE.

> Residential prerequisites for candidates for elective office can be so restrictive that, because they limit the pool of candidates, they intrude upon the traditionally fundamental right to vote.

6. JUDGES—ELECTIONS—MUNICIPAL JUDGES—RESIDENCY REQUIREMENTS—CONSTITUTIONAL LAW—RIGHT OF FREE TRAVEL—COMPELLING STATE INTEREST.

> A provision in a municipal charter which requires that a candidate for municipal judge be a two-year resident of the munici-

pality substantially affects the fundamental right of free travel between the states; this requires the municipality upon a challenge to the charter provision to demonstrate that the provision serves a compelling state interest; a purported justification for the residency rule, to insure that candidates are knowledgeable about local procedures and laws and known to the electorate, does not meet the strict standard (Charter for the City of Grosse Pointe Park §§ 5.1, 15.3).

7. JUDGES—ELECTIONS—MUNICIPAL JUDGES—MEMBERSHIP IN STATE BAR—QUALIFICATIONS OF CANDIDATES.

A restriction in a municipal charter which requires all candidates for the position of municipal judge to be licensed to practice law in Michigan for five years is too broad to fulfill its stated objective, that the candidate be highly proficient in the law, since it does not ensure that all candidates are knowledgeable in the law and at the same time may exclude highly qualified candidates (Charter for the City of Grosse Pointe Park §§ 5.1, 15.3).

*Joseph D. Grano, in propria persona.*

*Karen Smith Kienbaum* and *Robert J. Lech, in propria persona.*

*Markle & Markle* (by *Thomas K. DiPietro*), for Daniel E. Castner.

*Bodman, Longley, Bogle & Dahling* (by *Herold M. Deason*), for defendants.

Amicus curiae: *Edward M. Wise,* for American Civil Liberties Union.

Before: D. C. RILEY, P.J., and M. F. CAVANAGH and B. M. HENSICK,* JJ.

D. C. RILEY, P.J. The present appeal concerns the constitutionality of the city charter provisions of Grosse Pointe Park setting forth requirements for persons seeking to become candidates for the

---

* Circuit judge, sitting on the Court of Appeals by assignment.

office of municipal judge. Two provisions of the charter mandate that a candidate must be a two-year resident of Grosse Pointe Park and have been licensed to practice law in Michigan for five years prior to filing nominating petitions.[1]

Plaintiff Grano attempted to file the required petitions with the city for the municipal judge primary election to be held on August 2, 1977. The defendant city clerk rejected the petitions because plaintiff did not meet either requirement of the charter.[2] Plaintiff then instituted the present action in Wayne County Circuit Court, seeking to have the two charter provisions declared unconstitutional. Plaintiff McCloskey, a Grosse Pointe Park resident who signed Grano's nominating petition and sought to vote for him in the primary election, was joined as a plaintiff. Plaintiffs Kienbaum and Lech, who similarly had their nominating petitions rejected by the city clerk for failure to satisfy the charter requirements, intervened by stipulation.

Plaintiff Castner instituted a separate lawsuit after he had his petition rejected for failure to satisfy the five-year licensing requirement.

---

[1] Section 5.1 of the Grosse Pointe Park Charter reads in part:

"No person shall hold any elective office of the city unless he has been a resident of the city or Village for at least two years immediately prior to the last day for filing petitions for such office and is also a qualified and registered elector of the city on such day and throughout his tenure of office.

"The Municipal Judge (justice of the peace) shall, in addition, have the qualifications for that office prescribed in Section 15.3."

Section 15.3 reads:

"The presiding officer of the Court shall meet the eligibility requirements contained in Section 5.1 and, in addition, shall have been an attorney admitted to practice law in the Supreme Court of this state for a period of five years immediately preceding the date of his appointment or election. Neither he nor his business partners or employees shall have any part in any case before this Court."

[2] Plaintiff Grano had become a licensed member of the Michigan Bar in 1977 and had not lived in Grosse Pointe Park for two years prior to his filing date.

The trial judge, after holding hearings on both actions, ruled the charter provisions to be unconstitutional, and issued an order compelling the city clerk to accept the petitions and place the names of Grano, Keinbaum, Lech and Castner on the primary ballot. The present consolidated appeals are challenges by defendants to the trial court's orders.

Before discussing the particular constitutional issues raised, we must first speak to several preliminary, nonconstitutional issues that have been variously raised by the parties. The initial such question is mootness. We will state only briefly that the present controversy is not moot, even though the primary election has since been held, since the issue raised is one that is capable of repetition yet may evade review for the reason that the time period between when nominating petitions are filed and the subsequent election held is normally too short to allow the case to progress fully through the appellate system.[3] See *Roe v Wade,* 410 US 113, 124–125; 93 S Ct 705; 35 L Ed 2d 147 (1973).

The next question concerns the doctrines of res judicata and collateral estoppel. The trial court's opinions in the present cases relied heavily on the decisions rendered in several prior circuit court cases which involved identical challenges to Grosse Pointe Park's charter provisions.[4] The trial court

---

[3] In fact, the incumbent judge (who did not seek re-election) had brought a substantially identical lawsuit challenging the charter requirements in 1973. The trial court (as in the case at bar) found the requirements to be unconstitutional and ordered the petitions to be accepted, culminating in the incumbent's eventual election victory. *Urso v Clerk of the City of Grosse Pointe Park,* Wayne County Circuit Court #73-240-526. The city did not appeal the 1973 case.

[4] *Urso v Clerk of the City of Grosse Pointe Park, supra, Grobbel v Clerk of the City of Grosse Pointe Park,* Wayne County Circuit Court #73- 241-722 CZ.

held that the city was precluded by the previous cases, under res judicata and collateral estoppel, from relitigating the validity of its candidate requirements.

Although we can sympathize with the trial court's desire to rely on the previous decisions, we cannot agree that either res judicata or collateral estoppel barred review of the merits of the present lawsuits. In *Curry v Detroit,* 394 Mich 327, 331; 231 NW2d 57 (1975), the Supreme Court, discussing res judicata, stated:

"In *Tucker v Rohrback,* 13 Mich 73 (1864), the Court said that 'a judgment, to constitute a bar to a claim in a subsequent action, must be rendered upon the merits, upon the same matter in issue, and between the same parties or their privies'." (Footnotes omitted.)

The mutuality of parties requirement set forth in *Curry* applies equally to the doctrine of collateral estoppel. *Howell v Vito's Trucking & Excavating Co,* 386 Mich 37; 191 NW2d 313 (1971). In the present cases the plaintiffs are clearly not the same plaintiffs as in the 1973 cases and are not in privity to the prior parties. Even if the trial court felt obligated to follow the prior decisions, the application of res judicata and collateral estoppel to effectuate that purpose was erroneous.

Plaintiffs next argue that the city charter provisions are invalid because they conflict with state law setting forth qualifications for Michigan judges. The Michigan Constitution provides that justices and judges of any court of record must be licensed members of the bar, without mentioning any time period of licensing. Const 1963, art 6, § 19. Plaintiffs assert that the significantly stricter requirements of Grosse Pointe Park invalidly con-

flict with this provision of state law, contrary to MCL 117.36; MSA 5.2116:

"No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

Even though we agree with plaintiffs that it is illogical that a potential judicial candidate must meet more rigid qualifications for election as Grosse Pointe Park municipal judge than as justice of the Supreme Court or judge of the Court of Appeals, we cannot say that the city charter in this case contravenes the state standards. The Uniform Municipal Court Act (MCL 730.501 *et seq.;* MSA 27.3937(1) *et seq.),* seemingly allows individual standards for municipal judges to be set as long as the standards meet certain minimal requirements:

"The qualifications, term of office, time and manner of election, compensation, jurisdiction, powers and duties of the judges of the municipal court of any city affected by the provisions of this act, and the practice and procedure in such municipal courts, *shall be governed by the provisions of existing laws relating to justices of the peace in such cities, and to the practice and procedure in the courts of such justices of the peace,* except so far as the same or any part thereof are expressly repealed by or are inconsistent with any of the provisions of this act: Provided, however, That no person shall be eligible to qualify for judge of any such court who is not a regularly licensed attorney and counselor at law licensed to practice in the state of Michigan: Provided further, That any incumbent justice at the effective date of this act who is not an attorney at law shall be eligible for re-election as municipal judge of such court: Provided further, That no municipal judge, associate municipal judge or any partner of such judge or associate judge shall practice law in the

court to which he was elected or appointed." MCL 730.508; MSA 27.3937(8). (Emphasis added.)

We also note that the Supreme Court has upheld a municipal ordinance that set stricter standards than state law on a particular subject. See *Miller v Fabius Twp Board,* 366 Mich 250; 114 NW2d 205 (1962).

Having resolved all of the nonconstitutional questions raised by the parties, we now turn to the primary issue of the case, that being whether the city charter requirements of two-year residence and five-year licensing violated plaintiffs' right to equal protection of the law. US Const, Am XIV; Const 1963, art I, § 2.

In *Manistee Bank & Trust Co v McGowan,* 394 Mich 655; 232 NW2d 636 (1975), the Supreme Court discussed at length the appropriate tests to be applied in equal protection challenges to particular legislation. The test to be employed depends upon the nature of the individual interest affected by the legislation:

"[T]he United States Supreme Court developed a two-tiered approach to equal protection cases.

"If the interest is 'fundamental' or the classification 'suspect', the court applies a 'strict scrutiny' test requiring the state to show a 'compelling' interest which justifies the classification. Rarely have courts sustained legislation subjected to this standard of review.

"Other legislation, principally social and economic, is subjected to review under the traditional equal protection test. The burden is on the person challenging the classification to show that it is without reasonable justification. It has been said that '[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it'. A classification will stand unless it is shown to be 'essentially arbitrary'. Few statutes have been found so wanting in 'rational-

ity' as to fail to satisfy the 'essentially arbitrary' test."
(Footnotes omitted.) 394 Mich at 668.

⸱ Plaintiffs maintain that the candidate require-
ments burden several fundamental rights, includ-
ing the right to interstate travel,[5] the right to
vote,[6] and the right to freedom of association.[7]
Accordingly, plaintiffs assert that the present re-
quirements must satisfy the "compelling state in-
terest" test to survive constitutional attack. De-
fendants respond that the requirements do not
adversely affect fundamental rights, and thus
should be reviewed under the less stringent "rea-
sonable basis" standard. Defendants further argue
that the city's rationale for the requirements will
satisfy either test.

Our research has led us to several cases out of
the Federal courts which have dealt with dura-
tional residence requirements imposed by various
Michigan communities. These cases effectively an-
alyze the principal arguments raised by the pres-
ent parties.

In *Green v McKeon,* 468 F2d 883 (CA 6, 1972),
the Sixth Circuit considered the validity of a two-
year residency requirement for elective office in
Plymouth, Michigan. The *Green* Court initially
discussed the question of whether there was a
fundamental right to run for elective office. Citing
*Bullock v Carter,* 405 US 134; 92 S Ct 849; 31 L Ed
2d 92 (1972), the Court held that while there is no
recognized constitutional right to become a candi-
date, the strict scrutiny or compelling state inter-

[5] *Shapiro v Thompson,* 394 US 618; 89 S Ct 1322; 22 L Ed 2d 600
(1969).

[6] *Dunn v Blumstein,* 405 US 330; 92 S Ct 995; 31 L Ed 2d 274
(1972), *Bullock v Carter,* 405 US 134; 92 S Ct 849; 31 L Ed 2d 92
(1972).

[7] *Mancuso v Taft,* 476 F2d 187 (CA 1, 1973), *Headlee v Franklin
County Board of Elections,* 368 F Supp 999 (SD Ohio, 1973).

est test would be applied to residence require-
ments if it could be shown that the restrictions
had "a real and appreciable impact on the exercise
of the franchise". 405 US at 144. At some point,
residential prerequisites for candidates can thus be
so restrictive that, because they limit the pool of
candidates, they intrude upon the traditionally
fundamental right to vote. *Bullock v Carter, supra.*

The *Green* Court, however, deferred ruling on
whether the Plymouth two-year residency rule was
so restrictive as to "trigger application of the more
stringent standard",[8] choosing instead to base its
decision on a separate ground, that being the effect
of the residency rule on the right to travel:

"The durational residency requirement at issue classi-
fies Plymouth residents on the basis of recent travel.
That classification alone requires that the requirement
be strictly scrutinized because it operates to penalize
the exercise of the basic constitutional right to travel.
Dunn v. Blumstein, 405 U.S. 330, 338, 92 S.Ct. 995, 31
L.Ed. 2d 274 (1972). It is not material that the classifica-
tion denies new residents something that is not a
constitutional right, i.e., the right to become a candi-
date for public office." 468 F2d at 884.

Arguing that the two-year rule satisfies the
strict scrutiny test, the city contended that the
requirement was necessary to insure that potential
candidates for office in Plymouth be familiar with
the problems of the city and the form of the city
government. The Court rejected this argument.

"We hold that the two year residence requirement is
too broad for the achievement of that objective.
" 'It is not sufficient for the State to show that dura-
tional residence requirements further a very substan-
tial state interest. In pursuing that important interest,

---

[8] 468 F2d at 884.

the State cannot choose means which unnecessarily burden or restrict constitutionally protected activity. Statutes affecting constitutional rights must be drawn with "precision," * * * and must be "tailored" to serve their legitimate objectives. * * * And if there are other, reasonable ways to to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose "less drastic means." ' Dunn v Blumstein, supra, 405 U.S. at 343, 92 S. Ct. at 1003 (citations omitted).

"The restriction is in no way 'tailored' to achieve the stated municipal goal. It permits a two year resident of Plymouth to hold public office regardless of his lack of knowledge of the governmental problems of the city. On the other hand, it excludes more recent arrivals who have had experience in local government elsewhere or who have made diligent efforts to become well acquainted with the municipality." 468 F2d at 885.

The *Green* Court went on to state that the interest the city was seeking to protect, that candidates be informed and thereby qualified to hold office, would be insured by the elective process itself:

"Further, in our representative form of government, the voters are the arbiters of the suitability of candidates for public office. Whether a candidate has the ability to carry out the duties of a particular city office, even though he arrived in Plymouth less than two years prior to election day, is a matter for consideration by the voters in choosing between candidates running for that office. Opposing candidates undoubtedly will bring this deficiency, if it is one, to the attention of the electorate in the course of campaigning." 468 F2d at 885.

In three cases out of Federal district courts in Michigan, durational residency requirements were held invalid for reasons substantially identical to

those expressed in *Green v McKeon, supra.* In *Alexander v Kammer,* 363 F Supp 324 (ED Mich, 1973), the court invalidated the City of Pontiac's requirement that candidates for city commissioner be residents of Pontiac for five years and residents of the particular commissioner's district for two years. Citing *Bullock, supra,* and *Dunn, supra,* the *Alexander* court applied the compelling state interest test and concluded, as in *Green, supra,* that the city's interest in guaranteeing knowledgeable candidates did not justify the durational residence rule:

"Even assuming that the interests asserted by the City qualify as 'compelling,' the residency requirement in this case must fail. The fit of means to ends is far too imprecise to satisfy the 'tailoring' standard. Were this test satisfied, it is still questionable whether the mutual familiarity between candidates and the City which Pontiac wishes to promote is sufficiently compelling to justify any significant infringement upon the right to vote. That right gives rise to a presumption that 'the voters are the arbiters of the suitability of candidates for public office.' Green v McKeon, 468 F.2d 883, 885 (6th Cir. 1972). That freedom of choice may not lightly be restricted." 363 F Supp at 327.

Similar results were reached in *Mogk v Detroit,* 335 F Supp 698 (ED Mich, 1971), and *Bolanowski v Raich,* 330 F Supp 724 (ED Mich, 1971). In *Mogk* the court struck down a three-year residency rule for candidates for the city's charter commission. In *Bolanowski,* the court found invalid a three-year residence rule for the office of mayor of Warren, Michigan. The equal protection discussions in each of these cases paralleled those in *Green* and *Alexander.*

These cases concerning Michigan cities follow

the majority of jurisdictions that have considered durational residence requirements. See *McKinney v Kaminsky,* 340 F Supp 289 (MD Ala, 1972), *Draper v Phelps,* 351 F Supp 677 (WD Okla, 1972), *Smith v Evans,* 42 Cal App 3d 154; 116 Cal Rptr 684 (1974), *Cowan v Aspen,* 181 Colo 342; 509 P2d 1269 (1973), and cases collected in 65 ALR3d 1048. But see *Chimento v Stark,* 353 F Supp 1211 (D NH, 1973), *aff'd without opinion,* 414 US 802; 94 S Ct 125; 38 L Ed 2d 39 (1973), *Gilbert v State,* 526 P2d 1131 (Alas, 1974).

Our review of the cited cases convinces us that both candidate requirements of the Grosse Pointe Park City Charter violate the guarantees of equal protection. In regard to the two-year residency rule, we find that the restriction does substantially affect the fundamental right of free travel between the states, thus requiring defendants to demonstrate that the provision serves a compelling state interest. The city's purported justification for the residency rule, that being to insure that candidates are knowledgeable about local procedures and laws and known to the electorate, does not meet this strict standard. We agree with the decisions in *Green, supra, Alexander, supra, Bolanowski, supra* and *Mogk, supra,* that a flat residency rule is too vague and overreaching to be upheld as the least burdensome method of protecting the city's interests. We also have confidence, as expressed in the previous opinions, that the normal processes of our elective system will sufficiently insure that only qualified and knowledgeable candidates will gain office.

The five-year licensing provision exhibits similar deficiencies. As with the residency rule, the license requirement will discriminate against formerly out-of-state attorneys who have recently moved to

Grosse Pointe Park.[9] In this manner the provision adversly affects the right to travel. The city's argument that the license rule serves the public's interest in having only candidates that are experienced in the law likely to be applied in the municipal court is belied by the fact, as pointed out by plaintiffs, that the charter requires only the existence of a license for five years, with no requirement that the candidate ever in fact practiced in a legal capacity. The restriction is too broad to fulfill its stated objective since it does not insure that all candidates are knowledgeable in the law. At the same time it may exclude candidates who are highly qualified and clearly capable of performing to the most exacting standards. Again, free debate between the candidates should point out any defects in a particular candidate's legal qualifications, thereby allowing the voters to make an informed yet unfettered decision at the polls.

We hold that §§ 5.1 and 15.3 of the Grosse Pointe Park City Charter affect fundamental interests of potential candidates and, the city having failed to demonstrate that the provisions serve a compelling state interest, thus are unconstitutional as violative of equal protection. The judgments of the trial court are affirmed. No costs, a public question being involved.

---

[9] Although it is true that certain nonresident attorneys are licensed to practice law in Michigan and thus could satisfy the five-year rule immediately upon moving to Grosse Pointe Park, this fact merely decreases the number of persons in the excluded class by a minimal amount. The vast majority of out-of-state attorneys will be precluded from becoming candidates for some period of time up to five years.